**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| craigslist, Inc., | ) | Civil Action No: 2:09-1308-CWH |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| Henry D. McMaster, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

This matter is before the Court on the Defendants' motion to dismiss the Plaintiff's complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the Court dismisses the Plaintiff's action in its entirety.

## I. BACKGROUND AND PROCEDURAL HISTORY

This is an action seeking declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.[1] The plaintiff is craigslist, Inc. ("Plaintiff"), the operator of a popular Internet classified service. The craigslist website is one of the most popular websites in the world; it "provides largely free, localized, online classified ads and discussion forums in over 570 cities in 50 countries worldwide." Docket Entry #1 at ¶ 20. According to the Plaintiff, "[o]ver 50 million Americans use craigslist each month, posting over 40 million classified ads in over 100 categories, generating over 20 billion page views per month." Id. at ¶ 2.

---

[1] The Plaintiff also requests reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.



The Plaintiff organizes the craigslist website into separate websites for particular localities. In South Carolina, for example, the Plaintiff provides six different websites – one each for Charleston, Columbia, Florence, Greenville/Upstate, Hilton Head, and Myrtle Beach. Id. at ¶ 21. Each localized website provides users with a choice of categories and subcategories in which the user can post an ad or notice. Any person with Internet access can view postings on the craigslist website for free, id. at ¶ 25, and, as a general rule, users can post to the website free of charge.[2] Users posting on the website must accept the Plaintiff's "Terms of Use," which prohibit, among other things, posting content that is "unlawful" or that "advertises any illegal service." Docket Entry #1-1, Ex. A, ¶ 7 at (a) and (n).

As noted above, users can post to the craigslist website under a range of categories and subcategories.[3] This case revolves in large part around the "services" category, which, until recently, included a subcategory labeled "erotic." Id. at ¶ 29. The Plaintiff added this subcategory to its website in order to accommodate the requests of its users for a dedicated area in which "legal escort services, massage workers, exotic dancers, erotic phone lines and other services whose ads often contain adult content" could post ads, so that these service providers "would no longer post such ads in various other sections of the site." Id.

---

[2] The Plaintiff does note some exceptions to this rule: "(1) job ads in certain cities and broker apartment listings in New York City, for which a per-ad posting fee is charged; (2) ads in the recently terminated erotic services subcategory, for which craigslist, starting in late 2008, required a nominal fee charged to a valid credit card . . . and (3) ads in the newly created adult services category, for which a fee of $10 per posting is charged, again via valid credit card, to encourage compliance with site guidelines, for law enforcement tracking purposes, and to help defray the costs associated with this new category." Docket Entry #1 at ¶ 23.

[3] Examples include "community," "personals," "discussion forums," "housing," "for sale," "services," "resumes," "events," and "jobs." Docket Entry #1 at ¶ 22.



The Plaintiff alleges that it implemented various safeguards to prevent users from misusing the erotic services subcategory. For example, all users wishing to view content posted in the erotic services subcategory were required to make the following affirmations:

> Unless all of the following points are true, please use your "back" button to exit this part of craigslist:
>
> > 1. I am at least 18 years old.
> >
> > 2. I understand "erotic services" may include adult content.
> >
> > 3. I agree to flag as "prohibited" anything illegal or in violation of the craigslist <u>terms of use</u>. This includes, but is not limited to, offers for or the solicitation of prostitution.
> >
> > 4. I agree to <u>report suspected exploitation of minors</u> to the appropriate authorities.
> >
> > 5. By clicking on the links below, I release craigslist from any liability that may arise from my use of this site.

Docket Entry #1-1, Ex. B. Additionally, users posting to the subcategory were required to read and affirmatively agree to the following guidelines:

> **YOU MUST OBSERVE THE FOLLOWING GUIDELINES WHEN POSTING IN EROTIC SERVICES**
>
> **ADS IN VIOLATION OF THE FOLLOWING GUIDELINES OR OUR <u>TERMS OF USE</u> ARE SUBJECT TO REMOVAL WITHOUT REFUND**
>
> > 1. **"Erotic Services," like all categories on craigslist, may be used only for advertising LEGAL services.**
> > When using craigslist, you agree to abide by the craigslist <u>Terms of Use</u>, which forbid posting, emailing, or otherwise making available content that is unlawful, obscene, or which advertises illegal services.
> >
> > 2. **Do NOT suggest or imply an exchange of sexual favors for money – ads that do so are subject to removal without refund.**
> > [. . . ]



3. **Do NOT attempt to avoid detection of forbidden language by using spelling variations or text in images – ads that do so are subject to removal without refund.**
   [. . .]
4. **Do NOT include obscene images with your posting – ads containing obscene images are subject to removal without refund.**
   If you're not sure whether or not a particular image is obscene, do not post it.

**If you are unable to follow these guidelines, do not post on craigslist.**

Ads in violation of our Terms of Use or these guidelines are subject to removal without refund.

craigslist may supply information about your identity to law enforcement officers in response to legal subpoena.

**I have read these guidelines and will abide by them – proceed with erotic services.**

Docket Entry #1-1, Ex. C. Despite the Plaintiff's efforts, however, law enforcement personnel called the Plaintiff's attention to users' misuse of the craigslist website to facilitate unlawful activity. While the Plaintiff's complaint provides little detail with respect to the unlawful activity occurring on the website, a simple search of the federal reporters provides the answer – prostitutes, pimps, and johns use the website to facilitate their unseemly trade. See, e.g., United States v. Burnett, No. 09-1883, 2010 U.S. App. LEXIS 8765 at *4 (3d Cir. April 27, 2010) (noting that the defendant "admitted to posting pictures of [an underage prostitute] accompanied by his phone number on craigslist and to receiving responses to those postings by e-mail and telephone"); United States v. Todd, 584 F.3d 788, 789-90 (9th Cir. 2009) (defendant advertised female prostitutes on craigslist).

Beginning in March of 2008, the Plaintiff entered into consultations with U.S. state attorneys general, including South Carolina Attorney General Henry McMaster ("Attorney General McMaster"), and other local law enforcement officials concerning the abuse of the craigslist website by persons in the prostitution trade. Docket Entry #1 at ¶ 37. These consultations ultimately led to



the announcement of a joint statement between the Plaintiff, 40 state attorneys general (including Attorney General McMaster), and the National Center for Missing and Exploited Children, dated November 6, 2008, in which the Plaintiff voluntarily agreed to implement additional special measures in an effort to deter users from posting ads soliciting or offering prostitution in the erotic services subcategory. Id. at ¶ 38. These additional measures included telephone verification – "[i]n order to post in the 'erotic' subcategory, a user was required to provide a working phone number"; credit card verification – users had to submit "a valid credit card credential and pay a $5 fee in order to post an ad in the 'erotic' subcategory"; and keyword filtering – "craigslist . . . used electronic filtering to identify and block certain inappropriate words that it considered more likely to be associated with inappropriate postings to the 'erotic' subcategory." Id. at ¶ 39. And, in April of 2009, the Plaintiff implemented further measures meant to prevent images that had come to the attention of the Plaintiff and violated its Terms of Use from being reposted to the website. Id. at ¶ 40. According to the Plaintiff, the culmination of all of these efforts was an 80% reduction in the overall number of ads that users posted to the erotic subcategory for U.S. cities. Id. at ¶ 41.

These results apparently failed to satisfy Attorney General McMaster, however, and on May 5, 2009, he posted a letter on his office's website, addressed to the Plaintiff's CEO, Jim Buckmaster, in which Attorney General McMaster claimed that "it appears that the management of craigslist has knowingly allowed the site to be used for illegal and unlawful activity after warnings from law enforcement officials and after an agreement with forty state attorneys general." Docket Entry #1-1, Ex. E. The letter further provided that "the craigslist management may be subject to criminal investigation and prosecution by this office if the portions of the Internet site dedicated to South Carolina and its municipal regions and which contain categories for and functions allowing for the

solicitation of prostitution and the dissemination and posting of graphic pornographic material are not permanently removed on or before 5:00pm EST, the close of business Friday May 15, 2009." Id. Attorney General McMaster also held a press conference where, joined by a number of other South Carolina law enforcement officials, he referenced this letter and reiterated that he would seek to charge the Plaintiff's management if the Plaintiff did not shut down the erotic services category and remove obscene pictures from the South Carolina portion of the craigslist website.[4]

On May 12, 2009, the Plaintiff voluntarily implemented further measures to deter abuse of its website.  On that date, the Plaintiff stopped accepting new postings to the erotic services subcategory for all localities within the United States, including the six local websites provided for areas of South Carolina, and announced that the erotic services subcategory would be terminated within seven days. Docket Entry #1 at ¶ 43. The Plaintiff also introduced a new subcategory, called "Adult Services." Id. This subcategory operates with many of the same deterrent measures that the

---

[4] These events were reported in a May 6 news article displayed on the website of The State newspaper:

> McMaster said he has given Craigslist officials until 5 p.m. May 15 to shut down the erotic services section and remove obscene pictures from the South Carolina portion of the site.

> If that doesn't happen, McMaster said, he will seek to charge Buckmaster and other company officials under state prostitution or obscenity laws.  If twice convicted of aiding and abetting prostitution, for example, Buckmaster could be extradited to South Carolina upon a third charge, which carries a minimum one-year prison sentence and a $3,000 fine, he said.

> "I think that's what it's going to take to get anything done," said McMaster, a Republican who is a probable candidate in next year's governor's race. "The time for talking is over."

Docket Entry #1-1, Ex. F.



Plaintiff had formerly implemented in the erotic services category, but also employs an additional measure – each new posting to the Adult Services subcategory "is manually reviewed before it can appear on the website in order to ensure compliance with craigslist's posting guidelines and Terms of Use." Id. The Plaintiff claims that the effect of these measures has been "dramatic" – on May 18, 2009, there were a total of 40 ads for all localities in South Carolina served by the craigslist website posted in the erotic services and Adult Services categories combined. Id. at ¶ 44. Moreover, all of these advertisements complied with the Plaintiff's Terms of Use. Id.

Nevertheless, the Plaintiff alleges that these new measures still did not satisfy Attorney General McMaster. The Plaintiff notes that, on May 13, 2009, The State newspaper reported on its website that "South Carolina will not withdraw its threat of criminal prosecution despite today's announcement that Craigslist will stop allowing erotic classified ads on its popular Web site . . . ." Docket Entry #1-1, Ex. G. The article quoted Attorney General McMaster as stating that the Plaintiff's creation of a separate adult section "just does the same thing on a different location on the Web site" and "[t]he only agreement we could have is they block everything (related to prostitution and obscenity) in South Carolina." Id.

The next day, May 14, the Plaintiff's counsel sent Attorney General McMaster a letter that outlined the Plaintiff's efforts to address the Attorney General's concerns, noted the Plaintiff's belief that any attempt to impose criminal or civil liability on the Plaintiff would violate the First Amendment and the Communications Decency Act, 47 U.S.C. § 230, and requested assurances from the Attorney General's office "that the Attorney General does not intend to commence any prosecution or other adverse action against craigslist either on Friday, May 15 or before craigslist is given a further opportunity to hear from the Attorney General about any specific concerns that

#7
Ccch.

remain and a reasonable opportunity to respond to those concerns." Docket Entry #1-1, Ex. H. By

letter dated May 15, the Attorney General's office acknowledged receipt of the Plaintiff's letter,

stated that "[t]he concern of this office is the facilitation of prostitution in South Carolina," and noted

that "[p]rior to any prosecution in which this office is involved, you will certainly be allowed a

reasonable opportunity to respond." Docket Entry #1-1, Ex. I. That same day, though, the Attorney

General's office posted the following announcement on its official website: "As of 5:00 p.m. this

afternoon, the craigslist South Carolina site continues to display advertisements for prostitution and

graphic pornographic material. This content was not removed as we requested. We have no

alternative but to move forward with criminal investigation and potential prosecution." Docket Entry

#1-1, Ex. J. Between May 15 and May 18, several media outlets reported the Attorney General's

position,[5] and in multiple interviews he confirmed his intention to investigate and possibly prosecute

employees of the Plaintiff.[6]

---

[5] On May 15, 2009, the Associated Press quoted Attorney General McMaster: "'We were
hoping at 5 p.m. all those ads would be gone, and we'd be able to move on to other things,' he
said. 'Because they're not off, we won't be able to end our monitoring and scrutiny. . . . All
we're asking Craigslist to do is take the prostitution ads off its Web site.'" Docket Entry #1-1,
Ex. K. A May 16, 2009 article posted on TheState.com included the following: "'We will have
an active investigation in the office into Craigslist,' McMaster said. 'This content was not
removed as we requested. We have no alternative.'" The same article noted, though, that the
Attorney General could not prosecute "until a sheriff makes a prostitution case and brings the
evidence to the attorney general's office." The article also quoted McMaster as acknowledging
the additional measures implemented by the Plaintiff on the closure of the erotic services
category and the opening of the Adult Services category, and noting that these developments
meant that there was technically no firm deadline for the Plaintiff to comply with his demands.
Docket Entry #1-1, Ex. L. Still, a May 18, 2009 Wall Street Journal article noted: "On Monday
afternoon, McMaster's communications director Mark Plowden said that the 'matter is under
criminal investigation,' and that the AG's statement from Friday was still current." Docket Entry
#1-1, Ex. M.

[6] The Plaintiff alleges that Attorney General McMaster, in an interview with Fox News
on May 16, 2009, stated that: "We opened an investigation at 5:01 on Friday, as promised. . . .



On May 20, 2009, the Plaintiff instituted the current action. The complaint lists as defendants Attorney General McMaster and sixteen Circuit Solicitors of the state of South Carolina. It requests that this Court declare that the Defendants' threatened prosecution of the Plaintiff and its employees would be impermissible in light of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c); violates the First and Fourteenth Amendments to the United States Constitution; and violates the Commerce Clause. Docket Entry #1 at ¶¶ 65 to 73. The Plaintiff also seeks a permanent injunction barring the Defendants "from issuing further threats of prosecution against craigslist or its officers and employees in relation to content posted by third parties on craigslist's website and from initiating or pursuing any such prosecution." Id., Prayer for Relief.

At the time it filed the Complaint, the Plaintiff also moved for a temporary restraining order. Two days later, on May 22, 2009, the Court entered a consent order that provided: "Until the Court rules on the merits of craigslist's claims, Defendants and their attorneys and staffs shall refrain from initiating or pursuing any prosecution against craigslist or its officers and employees in relation to content posted by third parties on craigslist's website." Docket Entry #8. On July 21, 2009, the Defendants filed the instant motion to dismiss. Docket Entry #14.

## II. ANALYSIS

The Plaintiff's complaint raises three claims. First, the Plaintiff claims that the CDA immunizes providers of interactive computer services from criminal liability for the dissemination

---

We are preparing for a prosecution. We are investigating. We are moving forward. . . . The #1 defendant is Mr. Jim Buckmaster, who is the man in charge of craigslist. . . . craigslist is a big promoter and facilitator of prostitution." Docket Entry #1 at ¶ 57. The Plaintiff also alleges that in a May 18 interview with the Fox Business network, the Attorney General "again stated that he is conducting an active criminal investigation against craigslist for aiding and abetting prostitution, and likened craigslist 'to a hotel or motel owner that knows prostitution is going on on their premises and fails to do anything about it especially after having been told.'" Id. at ¶ 59.



of third-party content and that any state court prosecution of it or its employees by the Defendants for content posted to the craigslist website by third-parties would violate this federal immunity. Second, the Plaintiff claims that the Defendants' threatened prosecution violates the First Amendment, as incorporated against the states by the Fourteenth Amendment, because (1) it "constitutes an unlawful prior restraint on speech"; (2) it "is not the least restrictive means of accomplishing any compelling governmental purpose and because it is not narrowly tailored to accomplish any compelling governmental purpose"; and (3) it "seeks to impose criminal liability on . . . the operator of an information clearinghouse, in the absence of proof that craigslist in fact knew about the presence and unlawful nature of a particular item of third-party content on its website, and despite such knowledge deliberately failed to take action to block or remove that particular item." Docket Entry #1 at ¶¶ 85-87. Finally, the Plaintiff contends that the Defendants' threatened prosecution violates the Commerce Clause of the United States Constitution because (1) it "seeks to apply South Carolina law to regulate commercial transactions that take place wholly outside of the State of South Carolina" and (2) it "seeks to apply South Carolina law in manner [sic] that constitutes an unreasonable and undue burden on interstate commerce that is excessive in relation to any local benefit conferred on the State of South Carolina." Id. at ¶¶ 89-90.

In their motion to dismiss, the Defendants claim that dismissal of the Plaintiff's action is warranted for three reasons: (1) abstention is necessary under both Younger v. Harris, 401 U.S. 37 (1971), and Burford v. Sun Oil Co., 319 U.S. 315 (1943); (2) Section 230 of the CDA does not give the Plaintiff immunity from prosecution for aiding and abetting prostitution in violation of South Carolina criminal law; and (3) the Plaintiff has failed to state a claim upon which relief can be granted. Docket Entry #14. The Court requested supplemental briefing from the parties on two

Page 10 of 26

additional issues: (1) whether there is an active case or controversy between the parties and (2) whether, if the Plaintiff's constitutional claims are dismissed, the Court would continue to possess subject matter jurisdiction to consider the Plaintiff's claim for immunity under the CDA. The parties have submitted their supplemental briefs and replies, and this matter is now ready for a ruling. The Court takes each of the Plaintiff's claims in turn.

### A. The CDA Claim

The Court first addresses the Plaintiff's claim that the CDA protects it from prosecution by the Defendants. Specifically, the Plaintiff argues that two provisions of the CDA, §§ 230(c)(1) and 230(e)(3), interact to provide it with immunity from a state law prosecution based on the conduct of third-party posters to its website.[7] Section 230(c)(1) is an immunity provision; it "creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997). Section 230(e)(3) operates as a form of as-applied conflict preemption – it preempts state law to the extent that a specific application of that law conflicts with § 230(c)'s immunity provision. See Zeran v. Am. Online, Inc., 958 F. Supp. 1124, 1130-35 (E.D. Va. 1997).[8] Here, the Plaintiff argues that

---

[7] 47 U.S.C. § 230(c)(1) provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230(e)(3) further provides: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

[8] "Federal law may preempt state law in three ways, denominated as express preemption, field preemption, and conflict preemption." H&R Block Eastern Enters. v. Raskin, 591 F.3d 718, 722 (4th Cir. 2010). Express preemption occurs "when Congress has clearly expressed an intention to [preempt state law]." College Loan Corp. v. SLM Corp., 396 F.3d 588, 595-96 (4th Cir. 2005). Field preemption occurs "when Congress has clearly intended, by legislating comprehensively, to occupy an entire field of regulation." Id. at 596. Finally, conflict



attaching criminal liability under South Carolina law to its conduct – running an Internet classified service through which third parties have offered and solicited prostitution – would require treating the Plaintiff "as the publisher or speaker of . . . information provided by another information content provider." 47 U.S.C. § 230(c)(1). According to the Plaintiff, this application would violate § 230(c)(1), which would thus result in § 230(e)(3) preempting any such prosecution.

Importantly, neither the Plaintiff nor any of its employees has been arrested and prosecuted for violating South Carolina law. Thus, even if the Plaintiff's interpretation of the CDA is correct and it does provide the Plaintiff and its employees with immunity from a prosecution by the Defendants, the Defendants have not yet taken steps that would actually violate this immunity. Instead, the Plaintiff seeks to prevent such a violation before it can occur – the Plaintiff's CDA claim is in the form of a "preenforcement" challenge. Given this, the Court believes it prudent, before addressing the merits of this claim, to consider whether it presents an actual case or controversy over which this Court can exercise jurisdiction.[9] Cf. Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2717 (2010) ("Plaintiffs seek preenforcement review of a criminal statute. Before addressing the merits, we must be sure that this is a justiciable case or controversy under Article III.").

---

preemption occurs "when a state law conflicts with federal law." Id.

[9] Because the case or controversy requirement is at the heart of Article III jurisdiction, whether a particular dispute presents a live case or controversy is a question that a court may raise sua sponte. See Friedman's, Inc. v. Dunlap, 290 F.3d 191, 197 (4th Cir. 2002) ("The parties did not raise the issue of mootness, but the question of whether we are presented with a live case or controversy is a question we may raise sua sponte since mootness goes to the heart of the Article III jurisdiction of the courts." (internal citation and quotation marks omitted)); Rhodes v. E.I. du Pont de Nemours & Co., 657 F. Supp. 2d 751, 757 (S.D. W. Va. 2009) ("[F]ederal courts are obliged to satisfy themselves that they possess subject matter jurisdiction in every case, and may sua sponte raise the issue of standing.").



It is axiomatic that the Constitution limits the jurisdiction of federal courts to actual cases or controversies.[10]  Allen v. Wright, 468 U.S. 737, 750 (1984) ("Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"). "The 'case or controversy' label is used to embrace a number of related but different problems of judicial authority, including the requirement of a concrete dispute between adversaries, standing, ripeness, mootness and limitations relating to political questions." Neely v. Benefits Review Bd., 139 F.3d 276, 279 (1st Cir. 1998); see also Bryant v. Cheney, 924 F.2d 525, 529 (4th Cir. 1991) ("Doctrines like standing, mootness, and ripeness are simply subsets of Article III's command that the courts resolve disputes, rather than emit random advice."). For the following reasons, the Court finds that the Plaintiff's preenforcement CDA claim does not present an actual case or controversy suited for judicial resolution at this time.

### 1. Standing

"The doctrine of standing is an integral component of the case or controversy requirement." Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006). A plaintiff bears the burden of establishing three things in order to demonstrate constitutional standing: (1) that the plaintiff has suffered an actual or threatened injury that is not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged conduct; and (3) that a favorable decision is likely to redress the injury. Id. Cases involving a preenforcement challenge to a statute, like this one, present special challenges, especially with respect to the requirement that a plaintiff demonstrate an actual or threatened injury – an "injury in fact." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). These cases often present

---

[10] The plaintiff bears the burden of demonstrating that an actual case or controversy exists. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-62 (1992); Bronson v. Swensen, 500 F.3d 1099, 1106 (10th Cir. 2007).



difficult questions because preenforcement challenges necessarily involve allegations of an injury that is "hypothetical"; the injury – the application of a statute to protected conduct – has not yet occurred. Indeed, "allegations of possible future injury only rarely will satisfy the standing requirements of Article III." Kemler v. Poston, 108 F. Supp. 2d 529, 535 (E.D. Va. 2000).

When an injury is "certainly impending," however, a plaintiff need not await its actual occurrence in order to seek injunctive relief. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). The Supreme Court has stated this rule thus:

> When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."

Id. (quoting Doe v. Bolton, 410 U.S. 179, 188 (1973)); see also N.C. Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999) ("When a plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute."). Stated another way:

> Where a plaintiff has yet to face prosecution under a statute he seeks to challenge, the Supreme Court . . . requires that he establish Article III standing by (1) alleging an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and (2) demonstrating that there exists a credible threat of prosecution thereunder.

Ord v. District of Columbia, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (internal quotation marks and citations omitted); see also Va. Soc'y for Human Life, Inc. v. FEC, 263 F.3d 379, 386 (4th Cir. 2001) ("When a party . . . brings a preenforcement challenge to a statute or regulation, it must allege an intention to engage in a course of conduct arguably affected with a constitutional interest, and there must exist a credible threat of prosecution under the statute or regulation." (internal quotation marks

and citations omitted)).  The Court now considers whether the Plaintiff in this case has established

these two requirements, beginning with the second question – whether the Plaintiff is faced with "a

credible threat of prosecution."

a.  A Credible Threat of Prosecution

Here, the Plaintiff argues that standing exists because Attorney General McMaster has

threatened to pursue a criminal investigation and prosecution against the Plaintiff and its employees

despite the Plaintiff's insistence that the CDA provides it with immunity from prosecution.

Specifically, the Plaintiff challenges the Attorney General's stated intention to investigate and

prosecute the Plaintiff and its employees under South Carolina laws prohibiting the aiding and

abetting of prostitution.  See, e.g., S.C. Code § 16-15-90.  Before turning to a discussion of whether

Attorney General McMaster's statements and actions regarding the Plaintiff constitute credible

threats of prosecution, the Court first pauses to note that the Attorney General has, throughout the

time period covered by the complaint and the current litigation, put forward no fewer than two

separate theories of how the Plaintiff has violated South Carolina law.  The Court will treat each

separate theory of liability as a distinct threat.

First, the Attorney General's early pronouncements with respect to the Plaintiff suggest that

the Attorney General considered the existence of the erotic services category to itself be a violation

of South Carolina law.  For example, the Attorney General's May 5, 2009, letter to the Plaintiff's

CEO, which was also posted on the Attorney General's website, warned that "the craigslist

management may be subject to criminal investigation and prosecution by this office if the portions

of the Internet site dedicated to South Carolina and its municipal regions and which contain

categories for and functions allowing for the solicitation of prostitution and the dissemination and



posting of graphic pornographic material are not permanently removed on or before 5:00pm EST, the close of business Friday May 15, 2009." Docket Entry #1-1, Ex. E. Similarly, the Defendants, in their motion to dismiss the Plaintiff's complaint, make the following argument:

> By creating the "Erotic Services" section of its websites, Plaintiff encouraged development of the very advertisements at the heart of the Attorney General's expressed concerns. By continuing this category after acknowledging in November 2008 that it was being used to facilitate prostitution nationwide, Plaintiff essentially ratified, and became responsible for, the contents of advertisements it posted there, especially after Plaintiff was informed the illegal conduct continued.

Docket Entry #14-1 at 22. Under this theory, then, the Defendants appeared to argue that the Plaintiff violated South Carolina law by continuing to operate the Erotic Services category of its website after being alerted that third parties used the website for illegal purposes, regardless of whether the Plaintiff had knowledge of the illegality of any particular advertisement on the website.

Subsequent filings and the Defendants' own statements to this Court suggest that the Defendants are now proceeding on a different theory of liability that would focus on the Plaintiff's knowledge with respect to particular postings on the craigslist website. In their reply brief, for example, the Defendants contend:

> As the Attorney General has stated repeatedly, Plaintiff is under investigation for **knowingly** aiding and abetting prostitution. In order to proceed with an aiding and abetting prostitution charge, the State would have to show Plaintiff knew a particular advertisement was related to prostitution, and either continued to run it, or allowed the same individual to post similar advertisements.

Docket Entry #26 at 13-14 (emphasis in original). And, during the hearing of February 23, counsel for the Defendants stated the following:

> We've never threatened [prosecution] based just on a general knowledge that illegal ads were on there, even though in November of 2008, craigslist signed an agreement in which it acknowledged that its "Erotic Services" category was being used to facilitate unlawful conduct.

> We've never suggested that their – they have liability under our aiding and abetting statute because of this general acknowledgment they made. We have stated we would have to show they knew a specific ad was related to prostitution and they allowed it to be posted anyway.

Docket Entry #37 at 14:17 to 15:1. The Court notes that this appears to be a complete reversal from the position taken by Defendants in their original motion to dismiss, in which, as noted above, the Defendants did indeed suggest that the Plaintiff faced criminal liability for continuing to operate the Erotic Services category after acknowledging that it was being used for illegal purposes. See Docket Entry #14-1 at 22 ("By continuing this category after acknowledging in November 2008 that it was being used to facilitate prostitution nationwide, Plaintiff essentially ratified, and became responsible for, the contents of advertisements it posted there . . . ."). Reversal or not, the Defendants' position is now clear: the Plaintiff faces prosecution under South Carolina law if it "knew a particular advertisement was related to prostitution, and either continued to run it, or allowed the same individual to post similar advertisements." Docket Entry #26 at 13-14.

Thus, the Defendants have presented the Plaintiff with two distinct threats of prosecution under South Carolina law. First, the Defendants have claimed that the Plaintiff and its employees are subject to prosecution for simply continuing to run sections of their website after having been told that some users used those sections to facilitate unlawful activities. For the purposes of this Order, the Court will refer to this threat as "the generalized theory of liability." And, second, the Defendants now claim that the Plaintiff and its employees face prosecution if they were aware of particular advertisements related to prostitution but allowed them to be posted. The Court will refer to this threat as "the particularized theory of liability." The Court now considers whether either of these threats presents a "credible threat of prosecution."

i.

The Court first addresses whether the Defendants' generalized theory of liability presents the Plaintiff with a credible threat of prosecution. "In order to be considered credible, [a] threat must be both real and immediate, not merely conjectural or hypothetical." <u>Roe 1 v. Prince William Cnty.</u>, 525 F. Supp. 2d 799, 804 (E.D. Va. 2007) (internal quotation marks and citations omitted); <u>see also</u> <u>O'Shea v. Littleton</u>, 414 U.S. 488, 494 (1974). Here, the Court believes that the Plaintiff no longer faces a "real and immediate" fear of prosecution under the Defendants' generalized theory of liability.

In particular, the Court notes that the Defendants, in their representations to this Court, have apparently disclaimed any intention to attempt to apply this theory of liability to the Plaintiff. As noted above, the Defendants, during the hearing on this matter, stated: "We've never suggested that their – they have liability under our aiding and abetting statute because of this general acknowledgment they made. We have stated we would have to show they knew a specific ad was related to prostitution and they allowed it to be posted anyway." Docket Entry #37 at 14:22 to 15:1. Although the Court disagrees with the Defendants' characterization of their prior statements in this matter, the Defendants' representation indicates their abandonment of the generalized theory of liability. The Court believes that the Defendants' abandonment of this theory of liability supports a finding that the Plaintiff does not face a credible threat of prosecution under the Defendants' generalized theory.[11]

---

[11] The Court is aware that standing is ordinarily determined at the time of the filing of the complaint. See <u>Republic Bank & Trust Co. v. Kucan</u>, 245 F. App'x 308, 310 (4th Cir. 2007) (per curiam) ("Whether a plaintiff has standing is determined by considering the relevant facts as they existed at the time the action was commenced."). Thus, one could argue that the Court should not consider the Defendants' representations suggesting abandonment of the generalized theory,



ii.

At this stage in the litigation, the Plaintiff is only threatened with prosecution if the Plaintiff and its employees were aware of particular advertisements related to prostitution and nonetheless allowed them to be posted. The Court finds that this theory presents a credible threat of prosecution to the Plaintiff. As discussed below, though, the Plaintiff has failed to allege an intent to engage in conduct that would fall within the scope of this particular threat and thus lacks standing to raise a preenforcement challenge to the Defendants' particularized theory of liability.

b. The Plaintiff's Course of Conduct

The Court now addresses the other element that a preenforcement plaintiff must show in order to demonstrate the existence of standing: "an intention to engage in a course of conduct . . .

---

made after the commencement of the litigation, when conducting its standing analysis. The Court takes direction, however, from cases in which courts considered post-commencement prosecutorial disavowals of an intent to prosecute in conducting the standing inquiry. See, e.g., Winsness v. Yocom, 433 F.3d 727, 732-33 (10th Cir. 2006).

Moreover, even if the Court did limit its standing inquiry to the time of the filing of the complaint, and thus did not consider the Defendants' statements disavowing the generalized theory of liability, the Court believes that these statements would render moot any controversy resting on the Defendants' generalized theory. See, e.g., Graham v. Butterworth, 5 F.3d 496, 499-500 (11th Cir. 1993). The mootness inquiry is, after all, simply "the doctrine of standing set in a time frame." Townes v. Jarvis, 577 F.3d 543, 546 (4th Cir. 2009) (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997)). "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)." Id.; see also United Food & Comm. Workers Int'l Union v. IBP, Inc., 857 F.2d 422, 429 (8th Cir. 1988) ("A case is moot only when there is no reasonable expectation that the challenged activity will recur, an inquiry similar to whether a plaintiff lacks standing because there is no credible threat of prosecution." (internal quotation marks and citation omitted)). Whether considered as part of a standing inquiry or as part of a mootness inquiry, the Court believes the import and effect of the Defendants' statements to this Court remains the same – the Defendants have indicated that they will not prosecute the Plaintiff under the generalized theory of liability and this compels a finding that there is no active case or controversy with respect to this particular theory of liability.



proscribed by a statute." Babbitt, 442 U.S. at 298. Of course, a plaintiff need not actually violate the law before bringing a challenge to its threatened enforcement – a conditional statement of intent, alleging that the plaintiff would engage in a course of conduct but for the defendants' allegedly illegal action, may be sufficient to establish standing. See N.C. Right to Life Comm. Fund v. Leake, 524 F.3d 427, 435 (4th Cir. 2008). In other words, this Plaintiff must allege that it has in the past allowed, or intends in the future to allow, a particular ad to be posted to its website despite its knowledge that the ad relates to prostitution. The Plaintiff's complaint includes no such allegation, and, even making all reasonable inferences in the Plaintiff's favor, the Court cannot conclude that the Plaintiff's complaint could be understood to mean that the Plaintiff will knowingly allow particular prostitution ads to be posted on its website if the Defendants' threat of prosecution is removed. Cf. Ord, 587 F.3d at 1143 ("To be sure . . . Ord never alleges in so many words that he intends to enter the District of Columbia while armed. But at this stage of the litigation, we must make all reasonable inferences in Ord's favor . . . and viewed through that lens, Ord's complaint and affidavit can only be understood to mean that if the threat of arrest is removed, he intends to travel to D.C. while armed to engage in his security business."). Indeed, the allegations of the complaint point to the opposite conclusion. The Plaintiff alleges that such advertisements are prohibited under the Terms of Use of the website. Docket Entry #1 at ¶ 27. Moreover, the Plaintiff alleges that users of the website can "flag" for removal ads that violate the Terms of Use. Id. at ¶ 28. See also Docket Entry #1-1, Ex. C ("Ads in violation of our Terms of Use or these guidelines are subject to removal without refund."). It reasonably follows, then, that the Plaintiff would remove from its website those advertisements that it knows violate the Terms of Use – including advertisements for prostitution. Nor can it be said that the Plaintiff has adequately alleged an intent to knowingly allow such

advertisements in the future. The Plaintiff's termination of the Erotic Services subcategory in favor

of an Adult Services category in which every advertisement is subject to mandatory manual review

before it can be posted to the website instead suggests that the Plaintiff's intent is to <u>disallow</u> the

posting of prostitution advertisements in the future.

The Plaintiff's representations to the Court further support this conclusion. For example, the

Plaintiff states the following in its supplemental brief in opposition to the Defendants' motion to

dismiss:

> [T]his case can and should be decided without need for any factual inquiry into
> whether there has ever been a particular ad posted on the craigslist web site which
> pertained to unlawful solicitation, as to which craigslist had actual knowledge, and
> which craigslist nevertheless did not remove – for even in those circumstances,
> Section 230 would protect craigslist from liability. By framing its Section 230 claim
> in this manner, however, craigslist is not suggesting in any way that it concedes or
> believes such circumstances have ever occurred. To the contrary, craigslist abhors
> abuse of its service for illegal purposes, is generally not in a position to assess or
> know whether any of the millions of postings available through its site at any given
> time is from a user engaged in such abuse, and has voluntary [sic] instituted a host
> of innovative measures to prevent third parties from misusing its web site in
> furtherance of illegal activity.

Docket Entry #39 at 3 n.3. In short, the Plaintiff denies that it has ever engaged in the conduct that

the Defendants seek to prosecute and expresses no intention to engage in such conduct in the future.

Under such circumstances, standing to bring a preenforcement challenge to the application of a

statute does not exist. <u>See</u> <u>Dias v. City & County of Denver</u>, 567 F.3d 1169, 1176-77 (10th Cir.

2009); <u>Covenant Media of N.C., L.L.C. v. City of Monroe</u>, 285 F. App'x 30, 37 (4th Cir. 2008);

<u>Shotz v. Cates</u>, 256 F.3d 1077, 1082 (11th Cir. 2001).

In reaching this decision, the Court also finds instructive the Fourth Circuit's recent opinion

in <u>H&R Block Eastern Enters. v. Raskin</u>, 591 F.3d 718 (4th Cir. 2010). In <u>H&R Block</u>, the Fourth



Circuit made clear "that a federal court, <u>before</u> ruling that a federal law preempts a state statute, must determine that the state statute . . . stands as an obstacle to the objectives of the federal law . . . ." <u>H&R Block Eastern Enters.</u>, 591 F.3d at 723 (emphasis added).[12]  In other words, a federal court, before ruling on an as-applied conflict preemption claim, must determine whether the disputed state law provision actually applies to the conduct in question because the applicability of the state law to a plaintiff's conduct is "an essential element" of a conflict preemption claim.  <u>Id.</u>  Because the district court in <u>H&R Block</u> addressed the issue of preemption without first assessing whether the allegedly preempted state law applied to the plaintiff, the Fourth Circuit vacated the district court's judgment and, in so doing, made the following observation: "In asking the district court to proceed directly to the conflict analysis, without first independently determining whether the [state statute] actually applies to [the plaintiff], the parties were effectively seeking an advisory opinion." <u>Id.</u> at 723-24.

The Court believes that the Plaintiff, like the parties in <u>H&R Block</u>, is similarly requesting an advisory opinion.  By arguing that "this case can and should be decided without need for any factual inquiry into whether there has ever been a particular ad posted on the craigslist web site which pertained to unlawful solicitation, as to which craigslist had actual knowledge, and which craigslist nevertheless did not remove," the Plaintiff implies that whether it has engaged in such conduct is irrelevant to its claim for immunity.  Were this Court to accept this proposition and to ultimately decide that the CDA does not preempt state criminal prosecutions, the Plaintiff would remain free, during a subsequent state criminal proceeding, to argue that it has not actually violated

---

[12] As the Court has already noted, the Plaintiff's claim is one of as-applied conflict preemption.

South Carolina law.  Under such circumstances, the Court's ruling on the preemptive effect of the CDA would be "neither 'binding' nor 'conclusive'" with respect to the Plaintiff – in other words, the Court's opinion would be advisory. H&R Block Eastern Enters., 591 F.3d at 724.  Accordingly, the Court dismisses this claim.

### B.  The Constitutional Claims

The Court also dismisses the Plaintiff's constitutional claims.  Similar to the Plaintiff's claim for immunity under the CDA, the constitutional claims are preenforcement as-applied claims and thus suffer from the same deficiencies that necessitate the dismissal of the Plaintiff's CDA claim. In order to have standing, the Plaintiff must allege an intent to engage in the course of conduct that is threatened with prosecution – knowingly allowing particular prostitution advertisements to appear on its website – and it has not done so.  Moreover, since the Plaintiff denies ever having engaged in the conduct that the Defendants threaten with prosecution, the Court believes that addressing the constitutional implications of such a prosecution at this time would amount to an advisory opinion.

To be sure, the Plaintiff does advance claims based on the First Amendment, and courts often will take a broader view of a plaintiff's standing to mount a preenforcement challenge in cases where the defendant's conduct "tends to chill the exercise of First Amendment rights." N.C. Right to Life, Inc., 168 F.3d at 710.  Here, the Plaintiff claims that the Defendants' actions threaten to chill constitutionally protected speech.  The Plaintiff alleges that "[t]he effect of Defendant McMaster's threat is to shut down the operation of craigslist's South Carolina-directed site, thereby silencing vast amounts of protected speech[.]"  Docket Entry #1 at ¶ 71.  In other words, the only way to comply with the Defendants' demands and therefore avoid the threat of prosecution is to shut down the website entirely.

The Court is of the opinion that even this argument does not aid the Plaintiff's assertion of standing because the Plaintiff's allegations appear to rely on the Defendants' initial threats to prosecute based solely on the existence of prostitution ads on the Plaintiff's website. The Plaintiff argues that, since the Plaintiff cannot control every posting in every category on its website, there is no way to avoid such a prosecution except by taking down the website. But, as the Court has already discussed, the Defendants are no longer threatening to prosecute the Plaintiff under this generalized theory, and those threats no longer present a "credible threat."

Moreover, to the extent that the Plaintiff claims that its speech is chilled because the Defendants' threats to prosecute amount to an unlawful prior restraint on speech, see, e.g., Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963); Drive In Theatres, Inc. v. Huskey, 435 F.2d 228 (4th Cir. 1970), the Court notes that the Plaintiff supports its claim by relying on cases that involved efforts to censor a broad range of communication, the legality of which was in dispute. Here, the Defendants have only indicated an intent to censor speech aiding and abetting prostitution. Such speech is not entitled to First Amendment protection. See, e.g., United States v. Williams, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection." (citations omitted)); Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."); Rice v. Paladin Enters., 128 F.3d 233, 242 (4th Cir. 1997) ("[L]ong-established caselaw provides that speech



– even speech by the press – that constitutes criminal aiding and abetting does not enjoy the protection of the First Amendment[.]").[13]

## III. CONCLUSION

To conclude, the Court believes that this dispute, as it has been pleaded and argued to the Court, does not amount to a case or controversy sufficient to confer jurisdiction on the Court. The Plaintiff seeks to enjoin a threatened prosecution without alleging that it intends to engage in the conduct that the Defendants seek to punish. Moreover, the Plaintiff has failed to allege that the Defendants have singled out particular advertisements on the Plaintiff's website as warranting prosecution.[14]

In short, the Plaintiff requests an advisory opinion based on a hypothetical injury. This case arises because Attorney General McMaster has publicly stated his belief that the Plaintiff knowingly allows prostitution advertisements to appear on its website. The Plaintiff appears to deny that it does so. Given this denial, the Court cannot simply assume that such advertisements exist and that the Plaintiff will face prosecution. Under these circumstances, the Court believes that a dismissal of the Plaintiff's complaint is appropriate.

---

[13] Additionally, the Court notes that the Defendants have not singled out for prosecution any particular advertisements on the Plaintiff's website, but have instead only threatened "to invoke the judicial system to determine if the plaintiff ha[s] committed a crime." Eckstein v. Cullen, 803 F. Supp. 1107, 1117 (E.D. Va. 1992). Such a threat does not constitute a prior restraint. Id.

[14] Indeed, the Plaintiff relies primarily on statements by Attorney General McMaster to support its claim to standing. As already noted, however, the record before the Court suggests that the Attorney General lacks the authority to initiate a prosecution on his own and must wait for a particular case to be presented to him by a sheriff. There is nothing in the record suggesting that this has occurred.



**AND IT IS SO ORDERED.**

C. WESTON HOUCK
**UNITED STATES DISTRICT JUDGE**

August 5, 2010
Charleston, South Carolina